## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Master File No. 00-1334-MD-MORENO
Tag-Along Case No. 02-22065-CIV-MORENO/TORRES

IN RE: MANAGED CARE LITIGATION
_____ ,

MARTIN J. RUTT, D.D.S., and
MICHAEL EGAN, D.D.S., on behalf of
themselves and other similarly situated,

        Plaintiffs,

vs.

ANTHEM HEALTH PLANS, INC.,
d/b/a/ ANTHEM BLUE CROSS AND
BLUE SHIELD OF CONNECTICUT,

        Defendant.
_____ /

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

This matter is before the Court upon Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint. [D.E. 63]. The Honorable Federico A. Moreno referred this case to the undersigned for all pretrial proceedings. [D.E. 77]. After careful consideration of the motion, response, reply, and relevant authority, and being otherwise fully advised in the premises, we conclude that Plaintiffs' claims are not preempted by either Section 502(a)(1)(B) or Section 514(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and 1144(a). We further conclude that Plaintiffs failed to state a cause of action for unjust enrichment

but the other claims survive the motion to dismiss.  Accordingly, we recommend that the Court GRANT in part and DENY in part Defendant's motion to dismiss.[1]

## I.  BACKGROUND

Plaintiffs Martin J. Rutt, D.D.S.'s ("Rutt") and Michael Egan, D.D.S.'s ("Egan") (collectively, "Plaintiffs") are dentists who practice in Connecticut.  Defendant Anthem Health Plans, Inc. ("Defendant") offers managed care health and dental plans to Connecticut residents.  Plaintiffs participate in Defendant's network of dentists who provide services to individuals enrolled in Defendant's plans.  Plaintiffs became participating dentists by entering into contracts with Defendant ("provider agreements") whereby Plaintiffs agreed to provide dental services in exchange for compensation "in the amount specified in the Comprehensive Schedule of Professional Services, or the Usual, Customary and Reasonable allowable determination." [D.E. 45-1 (Participating Dentist and Blue Cross & Blue Shield of Connecticut, Inc. agreements with Plaintiffs dated October 27, 1983 and January 1, 1984)[2] at 13-14].

Plaintiffs' claims that Defendant underpaid them were originally filed in Connecticut state court.  Defendant removed the matter to federal court on the basis

---

[1]     We also deny as moot Plaintiffs' Motion for Default for failure to timely respond to the amended complaint.  [D.E. 60].  Defendant sought, with Plaintiffs' consent, an extension of time in which to respond; once the extension was granted, Defendant timely filed the motion to dismiss that is now before us.

[2]     The provider agreements are not attached to the Second Amended Complaint [D.E. 58] but we presume this was merely a clerical oversight.  When Plaintiffs sought leave to amend the complaint, they attached copies of the provider agreements to their proposed Second Amended Complaint.  [D.E. 45 at 1; D.E. 45-1 at 13-15].  The Second Amended Complaint expressly refers to the "attached contracts."  [D.E. 58 ¶ 4].  We therefore treat the provider agreements as if they were in fact attached to the Second Amended Complaint.

of ERISA preemption. Judge Moreno denied Plaintiffs' motion to remand [D.E. 2284 in Master File No. 00-1334-MD-MORENO], a ruling the Eleventh Circuit Court of Appeals affirmed on appeal. *Connecticut State Dental Association v. Anthem Health Plans, Inc.*, 591 F.3d 1337 (11th Cir. 2009) ("*CSDA*"). The Eleventh Circuit determined in relevant part that § 502(a)(1)(B) of ERISA completely preempted at least some portions of Plaintiffs' state law claims as alleged in the then-operative complaint. *Id.* at 1342. The preempted claims thus provided a basis for federal question jurisdiction, making denial of the remand motion appropriate.

On remand following appeal, Plaintiffs were permitted to amend their complaint. [D.E. 53]. They filed a Second Amended Complaint ("Complaint") alleging breach of contract, breach of the duty of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and unjust enrichment. [D.E. 58].[3]

The gist of Plaintiffs' allegations is that Defendant failed to pay them at the rate established by the provider agreements they had entered into with Defendant. According to the allegations of the Complaint, Plaintiffs agreed, pursuant to the provider agreements, to accept "as full and final compensation" for providing dental services to Defendant's dental plan members "the amount specified in the Comprehensive Schedule of Professional Services, or the Usual, Customary and

---

[3]     Plaintiffs bring this action on their own behalf and on behalf of a class of all other dentists in Connecticut who provided dental services to members of Defendant's dental plans pursuant to contracts substantially similar to Plaintiffs' provider agreements with Defendant at any time during the period April 15, 1996 through April 14, 2002. [D.E. 58 ¶ 4]. For convenience's sake, we refer only to Plaintiffs in this Order.

Reasonable allowable determination." [D.E. 58 ¶ 7]. The provider agreements automatically renewed each year. [*Id.* ¶ 22].

Defendant did not distribute a Comprehensive Schedule of Professional Services to Plaintiffs, electing instead to pay them pursuant to the Usual, Customary and Reasonable allowable determination ("UCR"). [*Id.* ¶¶ 8, 22-25]. In a memo dated August 1983 entitled "Common Questions and Answers about the Revised BC/BS Participating Dentists Agreements"[4] to dentists from Defendant's predecessor-in-interest Blue Cross Blue Shield of Connecticut ("BC/BS"), BC/BS discussed the methodology that Defendant would in the future employ to calculate the UCR fees for each dental current procedural terminology (CPT) code. [*Id.* ¶¶ 23-24]. The memo explained that the UCR fees would be based on objective criteria, including fee profile data and paid claims data, benchmarked to the 90th percentile. [*Id.*].

However, Defendant actually calculated the UCR fees with a secret, undisclosed and incorrect formula or simply made up the amount it would pay Plaintiffs. [*Id.* ¶¶ 8, 23]. Then, at some point during the relevant time period, Defendant ceased paying the miscalculated UCR fees and instead began paying something called the "maximum allowable amount" which was substantially lower than the UCR fees. [*Id.* ¶¶ 8, 25].

Plaintiffs expressly state in the Complaint that they are not bringing this action as assignees of Defendant's dental plan members' benefits "and any potential claim under an assignment of benefits is expressly disclaimed." [*Id.* ¶ 5]. Plaintiffs further

---

[4]   Plaintiffs did not attach a copy of the BC/BS memo to their Second Amended Complaint.

state they are not otherwise seeking benefits or other remedies under ERISA nor do their claims "arise under or relate to ERISA or an ERISA plan."  [*Id.*].

## II.   ANALYSIS

Defendant has moved for dismissal of the Complaint on the ground that some portions of Plaintiffs' state law claims are still completely preempted by ERISA § 502(a); the remainder of Plaintiffs' claims "relate to" ERISA and therefore are defensively preempted by ERISA § 514(a); and these now-recast-as-ERISA claims must be dismissed because Plaintiffs failed to exhaust their administrative remedies as required under ERISA.

Even if not preempted by ERISA, Defendant argues that the claims should be dismissed because they fail to meet the pleading requirements of Fed. R. Civ. P. 8(a); the breach of contract claim should be dismissed because it fails to state a claim and relies on impermissible parole evidence; the CUTPA claim alleges a garden-variety breach of contract claim which cannot support a CUTPA claim under Connecticut law; and the unjust enrichment claim cannot be maintained under Connecticut law unless the written contract on which it is based is alleged to be unenforceable at law, which is not the case here.

### A.   *ERISA Preemption*

We first must determine whether Plaintiffs' claims are preempted by ERISA. Defendant argues that both types of preemption – conflict, or defensive, preemption and complete preemption – apply here.

In *CSDA*, the Eleventh Circuit discussed the difference between the two types of preemption.  Complete preemption is jurisdictional in nature and is a recognized exception to the well-pleaded complaint rule.  591 F.3d at 1344.  Complete preemption derives from ERISA's civil enforcement provision, § 502(a), which has such "extraordinary" preemptive force that it "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65-66 (1987)).  Claims subject to complete preemption are removable to federal court.  *Id.*

Conflict preemption, on the other hand, is a substantive defense to preempted state law claims that arises from ERISA's express preemption provision, § 514(a), which preempts any state law claim that "relates to" an employee benefit plan.  *Id.*  It is not jurisdictional, being merely a defense, and is not a basis for removal to federal court.  *Id.*

The two types of preemption are related but not coextensive.  *Id.*  Complete preemption is narrower than conflict preemption. *Id.*  Thus, a state law claim may be defensively preempted under § 514(a) but not completely preempted under § 502(a). *Id.* (quoting *Cotton v. Mass Life Ins. Co.*, 402 F.3d 1267, 1281 (11th Cir. 2005)).

### 1.  *Complete Preemption*

The Eleventh Circuit in *CSDA* concluded that "at least some portions of" Plaintiffs' claims were completely preempted by ERISA ¶ 502(a).  591 F.3d at 1342. In reaching this conclusion, the court discussed and applied the two-part test for complete preemption enunciated in *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210

(2004).  The *Davila* test establishes a two-part inquiry:  (1) whether the plaintiff could have brought its claim under ERISA ¶ 502(a) and (2) whether no other legal duty supported the plaintiff's claim.  *Id.* at 1345.

As part of its analysis, the Eleventh Circuit approved a "rate of payment" versus a "right of payment" distinction "as a useful means for assessing preemption of health-care provider claims based upon a breach of an agreement separate from an ERISA plan."  *Id.* at 1350.  When a provider's claim is based on the amount, or rate, of payment from the insurer and depends on the terms of the  agreement between those two parties, not upon the terms of the insurer's employee benefits plans, the claim is based on a separate duty independent of ERISA and therefore does not implicate ERISA.  *Id.* at 1347-50.

In arguing the preemption issue in *CSDA,* Plaintiffs contended that they were not seeking benefits under an employee benefits plan but were merely seeking to collect unpaid amounts owed under their provider agreements with Defendant as a result of Defendant's use of improper payment methods.  *Id.* at 1350.  However, upon close examination of the allegations of the complaint, the Eleventh Circuit found that Plaintiffs' claims actually involved both the rate of payment under the provider agreements with Defendant and the right of payment, thus implicating Defendant's employee benefit plans.  *Id.* at 1350-51.  "What we have, then, is really a hybrid claim, part of which is within § 502(a) and part of which is beyond the scope of ERISA."  *Id.* at 1351.

Plaintiffs subsequently amended their complaint, ostensibly with the goal of removing all allegations that implicate ERISA. Defendant of course discounts their effort, arguing that Plaintiffs have not clearly abandoned the "right-to-payment" claims that previously were found to be completely preempted. Plaintiffs' attempt to avoid ERISA entanglement by expressly disclaiming any ERISA cause of action or claims involving the right to payment is unavailing, Defendant says, because how they style their complaint is irrelevant. Because the doctrine of complete ERISA preemption is an exception to the well-pleaded complaint rule, Plaintiffs cannot avoid ERISA preemption by "artful pleading." *See, e.g., Hall v. Blue Cross/Blue Shield of Ala.,*134 F.3d 1063, 1065 (11th Cir. 1998) (although plaintiff's complaint purported to rely exclusively on state law, she could not avoid federal jurisdiction if her allegations involved an area of law that federal legislation had preempted).

So, for instance, pointing to ¶ 21 of the Complaint and the reference therein to the ERISA benefits plans that Defendant offers to employees, Defendant asserts that Plaintiffs' claims for underpayment are "inextricably intertwined with these benefit plans." [D.E. 63 at 10]. Defendant contends that "Plaintiffs have no substantive right to compensation for their services – at any rate or level – apart from the health benefits promised to the ERISA plan participants." [*Id.*]. Defendant concludes that it will be necessary to assess the scope of ERISA plan benefits in order to determine whether Plaintiffs were properly compensated.

Defendant also seizes on Plaintiffs' use of the phrase "and other related documents" in ¶ 31 of the Complaint: "Defendant breached its obligations by

wrongfully lowering the rate of payment to [Plaintiffs] in violation of the Contract and other related documents."  [D.E. 58 ¶ 31].  Defendant hypothesizes that the "other related documents" could be the ERISA plans themselves.

Additionally, Defendant suggests that Plaintiffs' claim "may" incorporate partial denials of claims made by Defendant pursuant to ERISA plan terms.  [D.E. 63 at 11; D.E. 74 at 3 ("If even *parts* of the claims were denied for lack of coverage. . . ." (emphasis in original)].  Defendant claims it is impossible to tell whether the disputed claims here depend on partially denied claims or something else.  Defendant analogizes our case to *Lone Star Ob/Gyn Assocs. v. Aetna Health Inc.*, 579 F.3d 525, 533 (5th Cir. 2009), where the appellate court could not determine whether disputed payment claims were partially paid because the health insurance provider (Aetna) had denied the service for lack of coverage under an ERISA plan, or because Aetna had misinterpreted the provider agreement or made a mistake in referring to the proper fee schedule.

In *Lone Star*, Aetna asserted that the claims were partially paid because they resulted from a partial denial of benefits.  *Id.*  The health care provider (Lone Star), on the other hand, asserted that its payment claims were for services that Aetna had determined were covered by the plan but for which Aetna had paid the wrong contractual rate, e.g., by referring to the wrong rate in the applicable fee schedule.  *Id.*  While "any claims for underpayment under the Provider Agreement, which did not implicate the coverage determinations under the terms of the relevant plan, were not preempted under ERISA," on the record before it the *Lone Star* court simply could not

tell whether any of Lone Star's payment claims implicated coverage determinations and thus were preempted. *Id.*

Our case is different from *Lone Star* in one significant way. There is no evidence in this limited record that the claims for which Plaintiffs seek payment were partially denied. The Complaint alleges that Defendant agreed to compensate Plaintiffs at a certain rate but when making payments, reimbursed Plaintiffs at a rate different from and lower than the one required by the provider agreements. Based on a close examination of the allegations in the Complaint, none of the terms of Defendant's employee benefit plans appear to be at issue. Plaintiffs are not contesting coverage or eligibility, only the rate of payment. Defendant can only *speculate* that the payment claims "may" include claims that were partially paid and partially denied. Defendant has not pointed to any fact *in the pleadings* that contradicts Plaintiffs' assertion that payments were for claims that Defendant in fact determined to be covered.

We are unwilling to similarly speculate, bound as we are by only the pleadings in the light most favorable to Plaintiffs. We think Plaintiffs have successfully excised those allegations that the Eleventh Circuit found were not beyond the scope of ERISA. We read the Complaint to allege claims that are based only on the rate of payment, arise solely out of their provider agreements with Defendant, and do not implicate the terms of any ERISA plan. Accordingly, we hold at this stage that Plaintiffs' claims are not completely preempted by ERISA ¶ 502(a).

### 2.   *Conflict Preemption*

Defendant also argues that Plaintiff's rate of payment claims are preempted by ERISA ¶ 514(a), which preempts all state laws insofar as they "relate to" any employee benefit plan.  29 U.S.C. § 1144(a).  A state law "relates to" a covered employee plan "if it has a connection with or reference to such a plan."  *Dist. of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 (1992).

Defendant contends that all of Plaintiffs' claims for reimbursement depend on rights created by Defendant's employee benefit plans.  Defendant further claims it would not be possible to adjudicate these claims without interpreting various terms of the ERISA plans.  Defendant asserts, for instance, that to establish that payment was improperly reduced, Plaintiffs must first establish the appropriate level of coverage which necessitates reference to the ERISA plans and an interpretation of what qualifies as a covered service and what procedures are medically necessary.  The claims thus "relate to" ERISA plans and therefore are subject to preemption.

We disagree, both with the assertion that Plaintiffs' claims depend entirely on rights created by ERISA plans and that adjudication of these claims will necessitate reference to ERISA plans.  First, while we acknowledge that Plaintiffs' claims exist only because Defendant has ERISA plans, the claims themselves do not implicate the plans.  *See, e.g., Pascack Valley Hosp., Inc. v. Local 464A UFCW Welfare Reimbursement Plan*, 388 F.3d 393, 402-404 (3rd Cir. 2004) (hospital's state law claims were predicated on a legal duty independent of ERISA; while claims "are derived from an ERISA plan, and exist 'only because' of that plan," coverage and eligibility were not

in dispute and resolution of the lawsuit required interpretation of the subscriber agreements that were independent of the ERISA plan, not the plan itself).

Moreover, in *Lordmann Enters., Inc. v. Equicor, Inc.*, 32 F.3d 1529 (11th Cir. 1994), the Eleventh Circuit considered defensive preemption in the context of a negligent misrepresentation claim against an ERISA plan administrator.  The fact that the claim is not one raised in our case is irrelevant for our purposes here.  What is important is the discussion of the phrase "relates to" in ERISA § 514(a), and the conclusion that "state law claims brought by health care providers against plan insurers too tenuously affect ERISA plans to be preempted by the Act."  *Id.* at 1533; *see also In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1268 (S.D. Fla. 2001) ("*Shane I*"). The holding applies here, where the allegations of underpayment require reference to provider agreements independent of the Defendant's employee plans.

Defendant's attempt to distinguish *Shane I* flounders.  Judge Moreno concluded in *Shane I* that the health care providers' breach of contract claims, which allegedly were based on the terms of their own contracts with the health insurers, could be adjudicated "without a need for reference to the interpretation of ERISA plans."  135 F. Supp. 2d at 1268.  We reach the same conclusion about Plaintiffs' claims here, notwithstanding Defendant's protestations to the contrary.  Accordingly, we hold at this stage that Plaintiffs' claims are not defensively preempted by ERISA § 514(a).

### B.   *Rule 8(a)*

Defendant asserts other independent reasons for dismissal of Plaintiffs' claims. First, Defendant claims that Plaintiffs failed to meet the pleading requirements of Rule

8(a) as set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Rule 8(a) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This does not require "detailed factual allegations" but there must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  The point is to "give the defendant fair notice of what the [] claim is and the grounds upon which it rests." *Twombl*y, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556 (citation omitted).

Defendant argues that the Complaint alleges that Defendant "breached certain provider agreements in relation to *unspecified* claims for services for *unspecified* members covered by *unspecified*" dental benefit plans.  [D.E. 63 at 19 (emphasis in original)].  Such allegations, Defendant says, are too vague and nonspecific to meet the pleading requirements.  For support, Defendant cites *McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, No. 09-571 (SRC), 2009 WL 3242136 (D. N.J. Oct. 7, 2009), in which the trial court dismissed ERISA claims for unpaid benefit amounts brought by an insured against her employee health benefit plan provider.  *Id.* at * 1.  The court concluded that the plaintiff had failed under Rule 8(a) to give notice of what the defendant did in contravention of the terms of the health plans and/or in violation of ERISA.  *Id.* at * 3.

We find no similar infirmity here.  The allegations of the Complaint give notice to Defendant that Plaintiffs seek reimbursement for underpayment on all the claims Defendant paid for and for all the services that Plaintiffs provided to members of Defendant's plans.  The Complaint alleges that Defendant was contractually obligated to compensate Plaintiffs for rendering dental services in one of two ways:  according to the amount specified in the Comprehensive Schedule of Professional Services or the UCR allowable determination.  [D.E. 58 ¶ 7].  Defendant elected to pay according to the allowable UCR determination but did not; instead calculating UCR fees using "a secret, undisclosed and incorrect formula or simply made up the amount it would pay."  [*Id.* at ¶ 8].  Eventually Defendant "dropped the pretext that it was paying the [UCR] and paid radically lower fees which it called the 'maximum allowable amount.'"  [*Id.*].  The Complaint continues that Defendant "[t]hrough its improper schemes [] failed to pay [Plaintiffs] the amount of compensation which lawfully belongs to" them.  [*Id.* ¶ 9].  Here, Plaintiffs have alleged that Defendant did not pay them the proper amount under the provider agreements.  We conclude that the allegations of the Complaint set forth a sufficient factual basis for Defendant's liability on Plaintiffs' claims.

*McDonough* is factually distinguishable.  The court there found that the plaintiff had failed to sufficiently identify which actions or inactions by the defendant might support its liability for various ERISA violations.  2009 WL 3242136, at *3.  For instance, the plaintiff claimed that the defendant paid out-of-network reimbursements in amounts less than the defendant was contractually obligated to pay.  *Id.*  This apparently occurred because the defendant relied on an outside vendor's database to

determine the UCR and calculate benefits, and that database contained flawed data. *Id.* at * 1.  However, the court explained that the complaint did not "charge, or reasonably permit the inference, that [the defendant] was somehow involved in the generation of flawed data or complicit with the outside vendor such that it could be faulted, as a breach of the health plan, for inaccurate UCRs."  *Id.* at *3.

By contrast and unlike *McDonough*, in our case Plaintiffs have sufficiently pled which actions Defendant took that might plausibly support liability for underpayment of UCR fees.  Dismissal is not required.

### C.     *Breach of Contract Claim*

Defendant also argues that Plaintiffs' breach of contract claim should be dismissed because Plaintiffs failed to properly allege any contractual violation and because they impermissibly rely on parole evidence.  We reject those arguments, at least at this stage.

Defendant claims that because it was permitted, under the explicit terms of the provider agreements, to reimburse Plaintiffs based either on the amount specified in the Comprehensive Schedule of Professional Services or according to the UCR allowable determination, and Plaintiffs allege only that Defendant did not pay the UCR fees, they failed to state a breach.  That is, Defendant says it was perfectly entitled to reimburse according to either method, and because Plaintiffs failed to allege that Defendant breached *both* methods of compliance with the provider agreements, they have failed as a matter of law to state that a breach occurred.

We disagree.  Plaintiffs allege in the Complaint that Defendant never distributed a Comprehensive Schedule of Professional Services.  [D.E. 58 ¶¶ 8, 25].  In addition, Plaintiffs allege that through the August 1983 BC/BS memo, Defendant informed Plaintiffs it would use both fee profiles and paid claim data in administering the UCR system, and the memo set forth a methodology for calculating the UCR fees.  [*Id.* ¶¶ 23-24].  These allegations are sufficient to support Plaintiffs' claim that Defendant elected to reimburse Plaintiffs according to the UCR allowable amount, then failed to do so.  The allegations thus support a claim for breach of contract.

Defendant also contends that Plaintiffs impermissibly rely on parole evidence in the form of the 1983 BC/BS memo.  Defendant claims that the provider agreements are clear and unambiguous with regard to the compensation Plaintiffs were to receive: they would be paid either the amount specified in the Comprehensive Schedule of Professional Services, or the [UCR] allowable determination."  Because the BC/BS memo was not part of the provider agreements, Defendant argues it is extrinsic evidence on which Plaintiff may not rely to establish that Defendant breached a promise to Plaintiffs about payment calculations.

It is without dispute that parole evidence may not be used to vary or contradict the terms of an otherwise unambiguous contract.  *See, e.g., Buell Industrs., Inc. v. Greater New York Mut. Ins. Co.*, 791 A.2d 489, 501 (Conn. 2002) (where the terms of a contract are unambiguous, reference to extrinsic evidence is inappropriate).  But Plaintiffs are not doing that.  The parties agree that Defendant was entitled to reimburse Plaintiffs by one of two methods.  The BC/BS memo does not purport to vary

or affect that choice. Rather, the BC/BS memo with its discussion of the methodology that Defendant would employ in the future to calculate UCR fees supports Plaintiffs' contention that Defendant elected the UCR fees method of payment (rather than the other method). *See TIE Communications., Inc. v. Kopp*, 589 A.2d 329, 333 (Conn. 1991) (parole evidence rule does not forbid the presentation of parole evidence but rather, forbids the use of such evidence to vary or contradict the terms of an unambiguous contract). Importantly, *how* the UCR fees were to be calculated was not delineated in the provider agreements so the BC/BS memo cannot be said to vary the terms of those agreements.

We conclude, then, that Plaintiffs have sufficiently stated a claim for breach of contract based on the allegations that Defendant elected to reimburse Plaintiffs pursuant to the UCR method but instead underpaid them.

### D.   <u>CUTPA</u>

Plaintiffs allege that Defendant violated the CUTPA by advising it would pay Plaintiffs for all services that Plaintiffs provided according to the UCR allowable determination but then paid a lesser amount using a "secret, undisclosed and incorrect formula" or by "simply ma[king] up the amount it would pay." [D.E. 58 ¶ 8]. Later, Plaintiffs allege, Defendant dropped the pretext of paying UCR fees and began reimbursing at a lower "maximum allowable rate." [*Id.* ¶¶ 8, 25]. Plaintiffs further allege that Defendant hid its bad acts by using its "superior bargaining position to withhold relevant and necessary contract information from [Plaintiffs]." [*I*d. ¶ 10]. According to Plaintiffs, Defendant purportedly created an advisory board – the Dental

Advisory Board – so dentists "would have input into [Defendant's] actions concerning billing and other issues" but in reality the board never met or met so infrequently as to be meaningless. [*Id.* ¶ 41]. Plaintiffs assert that Defendant's conduct in "unfairly and deceptively reduc[ing] the rate of payments" to Plaintiffs was "immoral, unethical, oppressive and/or unscrupulous and/or immoral conduct and/or practices" that violate the CUTPA. [*Id.* ¶¶ 39-40].

The CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). A court considering whether a given action is unfair or deceptive must consider:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise - whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [ (competitors or other businessmen) ].

*Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1038 (2d Cir. 1995) (citation omitted). All three criteria need not be satisfied to support a finding of unfairness; "a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ventres v. Goodspeed Airport, LLC*, 881 A.2d 937, 969 (Conn. 2005).

Defendant seeks dismissal of the CUTPA claim on the ground that Plaintiffs have articulated nothing more than a garden-variety breach of contract claim which does not rise to the level of wrongdoing required to establish a violation of CUTPA.

The vast majority of courts in Connecticut have concluded that a simple breach of contract generally is insufficient to establish a violation of CUTPA. *See, e.g., Boulevard Assocs.*, 72 F.3d at 1038-39 (applying Connecticut law to hold that a simple breach of contract does not state a claim under CUTPA; a plaintiff must allege substantial aggravating circumstances in connection with the breach); *Rosenfield v. Klein*, No. NNHCV0850208925, 2008 WL 4635970, at * 3 (Conn. Super. Ct. Sept. 30, 2008) (noting the "split of authority in Connecticut Superior Court decisions regarding what is necessary to establish a CUTPA claim for breach of contract, the majority of courts holding that a simple breach of contract, even if intentional, does not amount to a violation of CUTPA in the absence of substantial aggravating circumstances") (citation omitted)); *Emlee Equip. Leasing Corp. v. Waterbury Transmission, Inc.*, 595 A.2d 951, 580 (Conn. Super. Ct. 1991) (no evidence of substantial aggravating circumstances shown where claim did not allege any fraudulent or deceptive practice or bad act in procuring the original leasing agreement or that agreement was anything but an arms-length transaction between two business enterprises).

However, "the same facts that establish a breach of contract may be sufficient to establish a CUTPA violation." *Lester v. Resort Camplands Int'l, Inc.*, 605 A.2d 550, 557 (Conn. App. Ct. 1992) (evidence that defendants unilaterally altered contract with plaintiffs so as to create additional revenues for defendants supported the jury's express finding that defendants intentionally engaged in unfair or deceptive acts or trade practices in dealing with plaintiffs); *see also, Greene v. Orsini*, 926 A.2d 708, 711 (Conn. Super. Ct. March 15, 2007) (allegations that defendants breached a

noncompetition agreement on several occasions notwithstanding repeated complaints by plaintiffs, causing substantial injury to a competing business, were sufficient to state a claim under CUTPA); *Cadle Co. v. Multi Unit Servs. Inc.*, No. 0393187, 2003 WL 21213434, at * 6 (Conn. Supr. May 12, 2003) (cumulatively, multiple breaches of a contract for maintenance and operational services, by overcharging property owner for those services, could be characterized as an aggravating circumstance); *Rosenfield*, 2008 WL 4635970, at * 3 - *4 (holding that plaintiff's allegations that defendant charged excessive fees in connection with the provision of tax advice, refused to return the unearned portion of the fees, and failed to account to the plaintiff properly, sufficiently stated conduct that could be characterized as immoral, unethical, oppressive or unscrupulous, and as aggravating circumstances, and so stated a claim for CUTPA violation).

We conclude that Plaintiffs have stated a viable CUTPA claim sufficient to survive a motion to dismiss.  Succinctly summarized, Plaintiffs are alleging that Defendant beached their contracts and intentionally underpaid them for every single claim submitted and every single service performed for a period of six years (1996 to 2002).  Such conduct, if proven, could be characterized as immoral, unethical, oppressive or unscrupulous, and cumulatively, the multiple breaches could constitute a substantial aggravating circumstance.  Dismissal is not appropriate.  Whether a CUTPA claim survives summary judgment review of the entire record is another matter.

### E. ___Unjust Enrichment___

Finally, Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed because Plaintiffs base their claims on the provider agreements with Defendant, however, under Connecticut law unjust enrichment is not available when based on the existence and breach of an enforceable contract. *See, e.g., Berman & Sable v. Nat'l Loan Investors, LP*, No. X06CV000167145S, 2002 WL 194528, at * 2 (Conn. Super. Ct. Jan. 16, 2002) ("A claim for unjust enrichment is not available in the situation where there is an enforceable express contract between the parties."); *Alliance Group Servs., Inc. v. Grassi & Co.*, 406 F. Supp. 2d 157, 166 (D. Conn. 2005) ("The quasi-contractual remedy of unjust enrichment is only available when no express contractual obligation exists." (citation omitted)).

Plaintiffs respond by arguing that they are entitled (under either federal or Connecticut state procedural rules) to plead breach of contract and unjust enrichment in the alternative. *See* Rule 8(a)(3) (a pleading that states a claim for relief must contain a demand "for the relief sought *which may include relief in the alternative* or different types of relief." (emphasis supplied)); Rule 8(d)(2), (3) (providing for alternative statements of a claim and permitting inconsistent claims); *Dreier v. Upjohn Co.*, 492 A.2d 164, 167 (Conn. 1985) (commenting that under Connecticut's pleading practice, a plaintiff may advance alternative and even inconsistent theories of liability in a single complaint).

Plaintiffs are correct that they can plead in the alternative but they made a fatal flaw in drafting here. They incorporated the breach of contract claim into their unjust

enrichment claim.   The first paragraph of Count IV (unjust enrichment) states: "Plaintiffs repeat and re-allege paragraphs 1-42 as if fully set forth herein." [D.E. 58 ¶ 43].  Paragraphs 1 through 42 set forth the factual allegations regarding the provider agreements as well as the breach of contract claim.  Consequently, Plaintiffs have incorporated into the unjust enrichment count the allegation that Plaintiffs and Defendant had an enforceable contract on which recovery might be had.  Moreover, nowhere in the Complaint do Plaintiffs allege any facts indicating that "in the alternative," their agreements with Defendant are unenforceable.

Given that an unjust enrichment theory depends on the lack of an enforceable contract, we conclude that the unjust enrichment claim here, as presently stated, is legally insufficient and fails as a matter of law.  *See, e.g., Robinson Aviation, Inc. v. City of New Haven,* No. CV095032399S, 2010 WL 3025803, at * 2 (Conn. Super. Ct. July 7, 2010) (where plaintiff incorporated the allegations of a breach of contract claim into the unjust enrichment count, so that the allegations in support of unjust enrichment relied on an express contract, unjust enrichment claim failed as a matter of law); *William Raveis v. Cendant*, No. CV054002709S, 2005 WL 3623815, at * 2 - *3 (Conn. Super. Ct. Dec. 6, 2005) (plaintiff incorporated the allegations of the previous counts of the complaint, including breach of contract allegations, into the unjust enrichment count; while plaintiff may plead unjust enrichment in the alternative, incorporating allegations of an express contract does not involve alternative pleading but legally inconsistent pleading); *Berman & Sable*, 2002 WL 194528, at *2 (count that

asserted both an express contract and claimed unjust enrichment was legally insufficient).

Accordingly, Count IV (unjust enrichment) should be dismissed, as illustrated in *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1338 (S.D. Fla. 2002), where Judge Moreno discussed the well-established principle that an unjust enrichment claim can exist only if the subject matter of the claim is not covered by a valid, enforceable contract.  When the plaintiffs in that case failed to explicitly allege that an adequate remedy at law did not exist, he dismissed the unjust enrichment claim.  *Id.*  "Although this Court has previously permitted a re-pleading of claims, at some point the cycle must end, and the next state will begin.  These claims are dismissed."  *Id.*  We follow Judge Moreno's lead and hereby recommend dismissal of  Count IV of the Second Amended Complaint, the unjust enrichment count, with prejudice.

### III.    CONCLUSION

Based on the foregoing, we hereby **RECOMMEND** that Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint [**D.E. 63**] be **DENIED in part and GRANTED in part** as follows:

1.    Defendant's Motion be **DENIED** in its entirety as to Counts I, II, and III.

2.    Defendant's Motion be **GRANTED** as to Count IV and Plaintiffs' unjust enrichment claim be dismissed with prejudice.

Furthermore, we hereby **ORDER** that Plaintiffs' Motion for Default [**D.E. 60**] be **DENIED as moot**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.   *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida this 31st day of March, 2011.

 */s/ Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge